**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**Susan-Kealoha C.,**

              **Plaintiff,**

v.                                                                  5:18-CV-515 (NAM)

**NANCY A. BERRYHILL, Acting Commissioner**
**of Social Security,**

              **Defendant.**

---

**Appearances:**

*Counsel for Plaintiff*:
Howard D. Olinsky
Olinsky Law Group
300 S. State Street, Suite 420
Syracuse, NY 13202

*Counsel for Defendant*:
Daniel Stice Tarabelli
Social Security Administration
Office of the General Counsel
15 Sudbury Street, Suite 625
Boston, MA 02203

**Hon. Norman A. Mordue, Senior United States District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I.  INTRODUCTION

Plaintiff Susan-Kealoha C. filed this action under 42 U.S.C. §§ 405(g), 1383(c)(3), challenging the denial of her applications for Social Security disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("the Act"). (Dkt. No. 1).  The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court.  (Dkt. Nos. 9, 11).  After carefully reviewing the administrative

record, (Dkt. No. 8), and considering the parties' arguments, the Court reverses the Acting Commissioner's determination, and remands for further proceedings consistent with this opinion.

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for DIB and SSI benefits on November 11, 2014, alleging that she became disabled on November 5, 2014 due to rheumatoid arthritis and post-traumatic stress disorder ("PTSD"). (R. 123, 132, 141–42). The Social Security Administration ("SSA") denied Plaintiff's claims on December 22, 2014. (R. 141–42). Plaintiff appealed and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 153). That hearing was held on November 9, 2016 before ALJ Robert Gale. (R. 76–122). On December 28, 2016, the ALJ issued a decision finding that Plaintiff was not disabled. (R. 10–19). Plaintiff's subsequent request for review by the Appeals Council was denied. (R. 1–5). Plaintiff commenced this action on April 30, 2018. (Dkt. No. 1).

### B. Plaintiff's Background and Testimony

Plaintiff was born in 1954 and 59 years old when she filed her disability claims in 2014. (R. 81, 123). She has a college education, and past relevant work experience as a property manager, house flipper, and administrative assistant. (R. 22, 111–12).

Plaintiff testified that she has suffered from PTSD since her son was killed in the war in Afghanistan. (R. 90). She testified that she has anxiety, depression, and "very bad social skills," stating she "won't go out in public." (R. 90). She reported a "bad back" that needed surgery. (R. 91). Plaintiff said she has difficulty being around unfamiliar people. (R. 99). She testified that she feels that "everybody's staring at me," and "[i]t makes me feel very uncomfortable."

(R. 99). When asked why she stopped working, Plaintiff testified: "I stopped working because . . . I realized my son was dead. I had suppressed it for so long that one morning I woke up on the 21st, looked at myself in the mirror, and it hit me full blown, my son was gone, and he wasn't ever coming back." (R. 101). She has gone to the ER after vivid dreams and nightmares involving her son. (R. 103–05).

She further testified that she has not been able to return to work since: "I can't seem to concentrate. I'm angry with people. My tolerance for ignorant people, I, I just don't, I don't, I can't do it. I can't, I can't, I can't be around people. Not even around my own kids." (R. 102). She has trouble concentrating. (R. 103). She takes Lisinopril for high blood pressure, Lorazepam for anxiety, Prozac for depression, and Harvoni for Hepatitis C. (R. 99–100). Plaintiff testified that she still feels the symptoms of her mental health conditions. (R. 100). She said she cries all the time, every day, and had to go to the hospital for an emotional breakdown. (R. 102). She is frequently depressed and anxious and has panic attacks. (R. 104–05).

With regard to her daily activities, Plaintiff testified that "I have someone grocery shop for me," and "I just don't do anything." (R. 90). She helps out with the housework at home and does the cooking. (R. 94). Her daughter takes care of the shopping. (R. 95). She has a friend who does the laundry, and friends that come over every week, but she does not go out. (R. 94–95). She takes care of her own personal hygiene and can pay the bills. (R. 95, 98).

### C. Medical Evidence

Plaintiff has sought treatment for health problems including back pain, Hepatitis C, depression, anxiety, and PTSD. The Court will briefly summarize the sources of evidence.

#### 1. Kathleen Joseph, Nurse Practitioner

On October 15, 2014, Plaintiff saw NP Joseph for pain in the lower back, pelvis, knees, and feet. (R. 348). She also reported difficulty sleeping. (R. 348). Review of systems noted loss of sleep, pain of bilateral joints "all over," joint swelling, and leg pain and swelling. (R. 349). On exam, NP Joseph noted diminished strength in the left leg. (R. 353). NP Joseph's assessment included chronic pain and pneumonia. (R. 350). NP Joseph prescribed Oxycodone-Acetaminophen (Percocet). (R. 350).

On October 29, 2014, Plaintiff reported joint pain, and depression related to her son's death in Afghanistan in 2009. (R. 352). Review of systems noted anxiety, depression, loss of sleep, pain of bilateral joints "all over," joint swelling, and leg pain and swelling. (R. 352). On exam, NP Joseph noted tearfulness and diminished strength in the left leg. (R. 353). NP Joseph assessed positive Rheumatoid factor, chronic pain and depression, and she referred Plaintiff to rheumatology. (R. 353). On November 25, 2014, Plaintiff reported daily pain, depression, and difficulty finding treatment or therapy without insurance. (R. 345). Percocet helped her pain. (R. 345). Review of systems remained the same. (R. 346). Exam noted diminished strength in the left leg and tearfulness. (R. 347).

On December 9, 2014, NP Joseph indicated that Plaintiff was compliant with instructions and her condition resulted in a severe emotional impact. (R. 386). On February 2, 2015, Plaintiff's condition remained the same. (R. 393). On May 12, 2015, Plaintiff reported that her rheumatologist had diagnosed Hepatitis C, and it was noted that she had a blood transfusion in the 1970's. (R. 403).

### 2. Andrew Catalone, Nurse Practitioner

On February 5, 2016, Plaintiff saw NP Catalone complaining of issues with PTSD, nightmares, depression, and anxiety. (R. 428). Review of systems noted difficulty

4

concentrating, anxiety, insomnia, excessive moodiness, stress, and disturbing thoughts. (R. 428). NP Catalone assessed PTSD, generalized anxiety disorder, and depressive disorder. (R. 430). On July 14, 2016, Plaintiff reported that her step son had just been killed on a motorcycle. (R. 432). NP Catalone assessed PTSD, generalized anxiety disorder, and depressive disorder. (R. 434). Visits on May 26 and September 2 of 2016 were mostly the same. (R. 436–43). Plaintiff continued on Lorazepam. (R. 443). On October 5, 2016, Plaintiff saw NP Catalone, who noted Plaintiff's medications to include Fluoxetine and Lorazepam; he continued to assess PTSD, generalized anxiety disorder, and depressive disorder. (R. 454–56).

On October 20, 2016, NP Catalone completed a Medical Source Statement for Plaintiff. (R. 468–70). NP Catalone stated he had seen Plaintiff monthly since December 23, 2014. (R. 468). He diagnosed Plaintiff with PTSD, generalized anxiety disorder, and depressive disorder. (R. 468). His prognosis was: "Patient suffers extreme PTSD [and] depression continues." (R. 468). He indicated that Plaintiff's symptoms included anhedonia, appetite disturbance, decreased energy, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience which are a source of marked distress, emotional withdrawal/isolation, flight of ideas, easy distractibility, sleep disturbance, and recurrent severe panic attacks. (R. 468). NP Catalone indicated Plaintiff had no useful ability to function in all assessed areas. (R. 469). NP Catalone explained: "This patient's severe mental handicap is so noted above, cannot be in work situation." (R. 469). NP Catalone also stated: "Patient's PTSD [and] depression dictates and produces inability to work." (R. 470).

NP Catalone stated that Plaintiff's psychiatric condition exacerbates her experience of chronic pain, and she was prescribed Lorazepam and Fluoxetine. (R. 470). NP Catalone also stated that Plaintiff's impairments were likely to produce good and bad days, she would be off-

5

task more than 20% during an 8-hour workday, and she would likely be absent as a result of her impairment or treatments more than four days per month. (R. 470).

### 3. Veronica Hamlett, Licensed Clinical Social Worker

In December 2014, an individual from US Army Survivor Outreach Service conducted a welfare check on Plaintiff having knowledge of suicidal ideation. (R. 481). Plaintiff was referred to counseling and saw LCSW Hamlett in December 2014, January, March, April, May, June, and December of 2015, and February and April of 2016. (R. 473–81). On December 22, 2014, Plaintiff reported nightmares, anger, and isolation. (R. 480). On January 2, 2015, Plaintiff reported auditory hallucinations. (R. 479). On June 2, 2015, Plaintiff reported significant liver problems, weight loss, and isolation. (R. 478).

### 4. Henry Klotz, M.D.

October 19, 2015, Plaintiff reported to gastroenterologist Dr. Klotz, who observed that she appeared anxious and complained of decreased appetite and weight loss. (R. 414). She weighed 97 pounds at the time. (R. 415). On November 23, 2015, she was less anxious and feeling better. (R. 417). On August 10, 2016, Dr. Klotz noted that Plaintiff was on Prozac and Ativan, and her affect was anxious. (R. 497–99).

### 5. Jangi Chi, M.D.

On July 25, 2016, Plaintiff saw Dr. Chi, who noted that she had acute neck pain with cervical spine disc disease and nerve compression and chronic lower back pain with degenerative disc disease. (R. 461). This was also noted in August 2016. (R. 459–60).

### D. Diagnostic Studies

An October 14, 2015 lumbar MRI revealed: marked desiccation of most of the intervertebral discs of the lumbar spine, especially of the L5-S1 disc, mild osteophyte disc

complex at the L3-4, L4-5, and L5-S1 levels, an associated annular tear suggested at L 4-5, L5-S1, and moderate ligamentous and mild facet hypertrophy at multiple levels throughout the spine, especially at the L3-L4 level. (R. 447). A cervical x-ray dated July 26, 2016 revealed subtle uncovertebral encroachment on the left neuroforamen at C5-6. (R. 467).

### E. Emergency Room Visits

October 12, 2015, Plaintiff went to the ER reporting that her right leg gave out and her lower back and right leg hurt. (R. 569). On November 3, 2015, Plaintiff went to the ER with a concern of carbon monoxide poisoning. (R. 527, 534). She was admitted to Auburn Community Hospital with diagnoses including depression/anxiety, malnutrition, and hypertension. (R. 527). Her medications included Lorazepam, Prozac, and Trazodone. (R. 534). She was discharged November 6, 2015. (R. 527).

### F. Consultative Examiners

#### 1. Christina Caldwell, Psy.D.

Dr. Caldwell conducted a psychiatric consultative examination of Plaintiff on December 4, 2014. (R. 347–78). Plaintiff reported that she was waiting for Medicaid to approve prescriptions for her Rheumatoid arthritis. (R. 374). She also stated she would like to take medication for anxiety and depression. (R. 374). She did not want to revert to alcohol, which she abused from March to July 2009. (R. 375). She reported difficulty falling asleep and frequent wakening, dysphoric moods, psychomotor retardation, crying spells, loss of usual interest, social withdrawal, diminished sense of pleasure, diminished self–esteem, and fatigue. (R. 374). She had panic attacks featuring palpitations, sweating, breathing difficulties, fear of dying, and trembling. (R. 375). "She was sobbing during the evaluation and could barely speak." (R. 375–76).

On exam, Dr. Caldwell found her judgment to be fair-to-poor with dysthymic mood and depressed and anxious affect. (R. 376). For activities of daily living, Dr. Caldwell noted that Plaintiff was able to dress/bathe/groom herself, but she needed help with cooking, cleaning, laundry, and shopping. (R. 376). Plaintiff said she withdrew from her friends as she did not want them to see herself as a less strong individual. (R. 376). Dr. Caldwell opined: "The results of the present evaluation appear to be consistent with psychiatric problems that likely interfere with her ability to function on a daily basis." (R. 377).

Dr. Caldwell concluded that Plaintiff evidenced mild to moderate limitations in her ability to perform simple and complex tasks independently, and she evidenced a moderate limitation in her ability to make appropriate decisions and relate adequately with others. (R. 377). Dr. Caldwell also opined that Plaintiff had marked limitations in her ability to appropriately deal with stress. (R. 377). Dr. Caldwell diagnosed Plaintiff with PTSD, major depressive disorder, panic disorder, and alcohol use disorder in sustained remission. (R. 377). Plaintiff's prognosis was guarded. (R. 377).

### 2. Kalyani Ganesh, M.D.

On December 4, 2014, Plaintiff underwent a physical consultative examination with Dr. Ganesh. (R. 379–82). Plaintiff reported she was diagnosed with Rheumatoid arthritis in October 2014, and she was waiting to see a specialist and to receive insurance. (R. 379). She reported "pain in the hip area, pelvic area, knees, and feet, and the toes feel separate," and that the pain came on gradually and became worse in September 2014. (R. 379). The pain was worst in the hips, feet, and knees. (R. 379). Plaintiff reported difficulty with prolonged walking, kneeling, or stairs. (R. 379). Plaintiff could shower and dress herself but needed help with cleaning and laundry. (R. 379). Her blood pressure was 180/120. (R. 380). Dr. Ganesh

8

observed that Plaintiff's lumbar extension, lateral flexion, and rotation were diminished. (R. 381). Dr. Ganesh diagnosed elevated blood pressure, history of PTSD, and history of rheumatoid arthritis. (R. 381). Dr. Ganesh found no gross physical limitations. (R. 382).

### 3. S. Bhutwala, M.D.

Plaintiff's medical records were also examined by Dr. Bhutwala for the purpose of providing a consultative opinion. (R. 123–31). Dr. Bhutwala assessed two impairments: inflammatory arthritis and anxiety disorder. (R. 126). Dr. Bhutwala found that Plaintiff's depression and anxiety affected her ability to adapt to changes and stress, but that she retained the mental capacity to perform the basic functions of unskilled work. (R. 130). Dr. Bhutwala indicated that Plaintiff had moderate limitations on her ability to interact appropriately with the general public, to work in coordination or in proximity to others without being distracted, and in responding to changes in the work setting. (R. 129–30). Dr. Bhutwala also reported that she had sustained concentration and persistence limitations. (R. 129). Dr. Bhutwala found that Plaintiff had no limitation or no significant limitation on various abilities including: understanding and memory, following instructions, and working a regular schedule. (R. 129–30).

### G. ALJ Decision Denying Benefits

On December 28, 2016, the ALJ issued a decision denying Plaintiff's applications for disability benefits. (R. 10–19). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in gainful employment since November 5, 2014, the alleged onset date for her disability. (R. 12).

At step two, the ALJ determined that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff had five "severe" impairments: mild degenerative disc disease of the lumbar spine, history of hepatitis C, depression, anxiety, and PTSD. (R. 12). At step three, the ALJ found

9

that, while severe, Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 13). As to Plaintiff's degenerative disc disease, the ALJ found that she did not meet the criteria for Listing 1.04 because there was no evidence of "compromise of a nerve root or the spinal cord." (R. 13).

As to Plaintiff's mental impairments, the ALJ found that considered singly and in combination, they "do not meet or medically equal the criteria of listings 12.04 and 12.06." (R. 13). The ALJ found that Plaintiff had only "mild restriction" in activities of daily living; the ALJ noted that while Plaintiff needed limited help with some tasks, "she maintains personal care, prepares simple meals, attends appointments, goes out alone, shops and manages money." (R. 14). The ALJ found that Plaintiff had only "moderate difficulties" in social functioning; the ALJ noted that while Plaintiff appeared emotional, depressed, and anxious at the consultative examination, she was cooperative, communicative, and reported regular social interaction. (R. 14). Next, the ALJ found that Plaintiff had "moderate difficulties" with regard to "concentration, persistence or pace." (R. 14). The ALJ noted that although Plaintiff reported concentration difficulties, "she had coherent and goal directed thought processes, as well as intact attention, concentration and memory" at the consultative examination. (R. 14). The ALJ also noted that Plaintiff did not have any episodes of decompensation. (R. 14).

At step four, the ALJ determined that Plaintiff:

> has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can only squat to seventy-five percent. The claimant can understand, remember, learn new and perform simple and some more complex tasks; maintain attention/concentration; maintain a regular schedule;

10

>relate adequately with the public and coworkers; and would be off-task three-to-five percent of the workday.

(R. 15). The ALJ stated that the RFC "is based on the opinions of S. Bhutwala, Ph.D., Christina Caldwell, Psy.D., and Kalyani Ganesh, M.D., and these opinions are given great weight." (R. 16). The ALJ noted that Dr. Bhutwala found that Plaintiff retained "the ability to perform the four basic functions of unskilled work," and that Dr. Ganesh found that Plaintiff had no physical limitations. (R. 16). The ALJ further noted Dr. Caldwell's opinion that Plaintiff "has mild-to-moderate limitations with regard to performing simple and complex tasks independently; moderate limitations with regard to making appropriate decisions and relating adequately with others; and marked limitations with regard to appropriately dealing with stress." (R. 16).

As to Plaintiff's symptoms, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce her alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 17). The ALJ stated that "treatment notes indicate the claimant has cooperative behavior, good eye contact, normal psychomotor activity, normal speech, goal-directed thought processes, no abnormal thought content, intact attention/concentration and intact memory." (R. 17). The restrictive opinion of NP Catalone was given little weight because it was inconsistent with his treatment notes and the opinion of the consultative examiner. (R. 17). The ALJ stated that the RFC was "supported by the treatment notes, clinical findings and diagnostic testing of record." (R. 17). The ALJ's step four analysis concluded that Plaintiff was unable to perform past relevant work. (R. 18).

Finally, at step five, having evaluated Plaintiff's medical limitations, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity,

the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), 404.1568(d), 416.969, 416.969(a), and 416.968(d))." (R. 18). The ALJ also found that Plaintiff "retains the ability to perform several unskilled jobs at the medium exertional level." (R. 18). The ALJ cited the testimony of the vocational expert, Esperanza DiStefano, who testified at the hearing that an individual in Plaintiff's position would be able to perform the requirements of occupations including Linen Room Attendant, Hand Packer, and Cleaner. (R. 24). In sum, the ALJ concluded that "although the claimant's additional limitations do not allow the claimant to perform the full range of medium work, considering the claimant's age, education and transferable work skills, a finding of 'not disabled' is appropriate under the framework of Medical-Vocational Rule 203.16 and Rule 203.08." (R. 19).

### III. DISCUSSION

#### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the

> [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The Regulations define residual functional capacity ("RFC") as "the most you can still do despite your limitations," including limitations on physical and mental abilities. 20 C.F.R. §§ 404.1545, 416.945. In assessing the RFC of a claimant with multiple impairments, the Commissioner considers all "medically determinable impairments, including . . . medically determinable impairments that are not 'severe.'" *Id*. §§ 404.1545(a)(2), 416.945(a)(2). The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

### C. Analysis

Plaintiff argues that, in not finding her disabled, the ALJ erred in two key respects: 1) "the ALJ assessed an RFC that does not comport with his own Step Three finding, and therefore, his decision is internally inconsistent and unsupported by substantial evidence," and 2) "the ALJ failed to adequately account for the opinion evidence and explain his decision in accordance with regulation, resulting in an RFC unsupported by substantial evidence." (Dkt. No. 9). Essentially, Plaintiff argues that the ALJ's RFC fails to fully consider and account for her mental limitations.

Plaintiff points out that the ALJ assessed an RFC for medium work and that Plaintiff "can understand, remember, learn new and perform simple and some more complex tasks; maintain attention/concentration; maintain a regular schedule; relate adequately with the public and coworkers; and would be off-task three-to-five percent of the workday." (R. 15). Plaintiff contends that this RFC is inconsistent with the ALJ's findings at step three that Plaintiff had

14

"moderate difficulties" in social functioning and "moderate difficulties" in maintaining concentration, persistence, or pace. (R. 14). In addition, the ALJ noted Dr. Caldwell's opinion that Plaintiff had "marked limitations with regard to appropriately dealing with stress." (R. 16).

The Court finds that the ALJ failed to consider these mental limitations in formulating the RFC for Plaintiff. According to the Regulations, the RFC must "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." SSR 96-8P. Among those functions are mental abilities:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(c), 416.945(c). In addition, "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF." SSR 96-8P. Here, the ALJ failed to identify any limitations or restrictions in Plaintiff's RFC based on her mental abilities, despite his finding that she had several moderate to marked limitations on, inter alia, social functioning, concentration, and dealing with stress. A proper evaluation of these limitations required a detailed function-by-function assessment.

In a similar case, the court put it thusly:

> ALJ Gale's decision gives no clue as to how his elongated residual functional capacity finding accommodates or takes into account Reynolds's moderate mental limitations in ability to understand,

15

> remember, and carry out detailed instructions, maintain attention and concentration for extended periods, maintain socially appropriate behavior, and respond appropriately to changes in the work setting. A residual functional capacity for sedentary work with postural and environmental limitations accommodates Reynolds's *physical* impairments, but if there is an evidentiary basis for concluding that semi-skilled and unskilled work automatically takes into account the moderate *mental* limitations just mentioned, it appears nowhere in the decision. This renders ALJ Gale's findings at Step 4 and Step 5 of sequential evaluation unsupported by substantial evidence, and raises a specter of concern that ALJ Gale may have inadvertently forgotten the moderate limitations he found under the special technique for evaluating severity of mental impairments and also at the outset of his residual functional capacity assessment.

*Reynolds v. Colvin*, No. 13 Civ. 396, 2014 WL 4184729, at *6, 2014 U.S. Dist. LEXIS 117417, at *23–24 (N.D.N.Y. July 14, 2014). Here too, it was error for the ALJ not to specifically account for Plaintiff's mental limitations as part of the RFC.

The Government, however, argues that "[a]ny error is harmless because someone who experiences those limitations can still perform the jobs the ALJ relied on in finding her not disabled at step five." (Dkt. No. 11, p. 3). According to the Government, "Plaintiff's concentration, persistence, or pace, social interaction, and stress limitations would not prevent her from performing the jobs the ALJ relied upon in finding her not disabled." (*Id.*, p. 7). The Government suggests that an RFC that does include Plaintiff's mental limitations would nonetheless still allow her to perform the jobs identified with her erroneous RFC. Although the Government points to some support for this proposition, the Court is unwilling to so speculate. *See Bartrum v. Astrue*, 32 F. Supp. 3d 320, 331 (N.D.N.Y. 2012) ("This Court simply cannot, and will not, re-weigh the medical evidence and/or create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself.").

Ultimately, the Court finds that remand is appropriate in this case for the ALJ to properly determine Plaintiff's RFC based on both her physical *and* mental limitations. As part of that process, the ALJ should also specifically explain how the medical evidence relating to Plaintiff's mental limitations translates into the RFC. Plaintiff also argues, with some merit, that "it is unclear that the ALJ has actually applied the functional opinions to which he stated he afforded great weight." (Dkt. No. 9, p. 17). For example, Dr. Caldwell found that Plaintiff had mild to moderate limitations in her ability to perform simple and complex tasks independently, moderate limitation in her ability to make appropriate decisions and relate adequately with others, and marked limitation in her ability to appropriately deal with stress. (R. 377). Yet the RFC stated that Plaintiff: "can understand, remember, learn new and perform simple and some more complex tasks; maintain attention/concentration; maintain a regular schedule; relate adequately with the public and coworkers; and would be off-task three-to-five percent of the workday." (R. 15). The ALJ indicated that the RFC accounted for Plaintiff's inability to deal with stress, but it is not clear how. Indeed, while Dr. Caldwell noted that Plaintiff's psychiatric problems would "likely interfere with her ability to function on a daily basis," (R. 377), the ALJ did not find any such limitations or explain how they factored into the assessment. The RFC is flawed for this reason as well.

Finally, as the medical understanding of mental health continues to evolve, so too must its treatment in disability proceedings. In a recent Second Circuit decision, the court noted that "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Estrella v. Berryhill*, 17-3247, 2019 WL 2273574, at *4, 2019

U.S. App. LEXIS 15869 (2d Cir. May 29, 2019) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)). Notably, a person with mental illness may have good days and bad days. *Id.* The court cautioned that "a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health." *Id.* at *5. On remand, the ALJ should consider the unique aspects of mental illness and their impact on Plaintiff's limitations.

### IV. CONCLUSION

For the foregoing reasons it is

**ORDERED** that the decision of the Acting Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date:   June 28, 2019
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge